## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| KRISTIN TILSON, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) |
| | ) |
| | ) |
| UNITED OF OMAHA LIFE | ) |
| INSURANCE COMPANY, | ) |
| | ) |
| Defendant. | ) |

## **COMPLAINT**

COMES NOW Plaintiff, Kristin Tilson, and for her claims and causes of action against

Defendant, United of Omaha Life Insurance Company, states as follows:

### PARTIES

1. Kristin Tilson ("Tilson") is a resident and citizen of the State of Kansas.

2. Defendant United of Omaha Life Insurance Company ("United") is an out-of-state

   insurance company authorized to do business in the State of Kansas. The Commissioner

   of the Kansas Department of Insurance is authorized to accept service of process on

   behalf of United.

### JURISDICTION AND VENUE

3. Tilson brings her claim pursuant to the Employment Retirement Income Security Act

   ("ERISA") and 29 U.S.C. § 1001 *et seq.*

4. This dispute is governed by a welfare benefits plan and its policy documents, as well as

   applicable federal law regarding employer provided benefits. 29 U.S.C. § 1132(e)(1).

1

5.    This Court also has subject matter jurisdiction pursuant to the general jurisdictional statute for civil actions arising under federal law. 28 U.S.C. § 1331.

6.    Venue lies in the District of Kansas under 29 U.S.C. § 1332(e)(2), as the breach occurred in this district, and because the welfare benefits plan is administered in this district.

7.    Venue is also proper pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events and/or omissions giving rise to this action occurred within this judicial district.

<u>INFORMATION REGARDING TRIAL</u>

8.    No jury trial is allowed under ERISA law.

9.    Trial is to be held in Kansas City, Kansas.

<u>STATEMENTS OF FACT</u>

10.    Beginning April 9, 2018, Wagner Logistics employed Tilson as Director of Human Resources.

11.    Wagner Logistics sponsored a group short-term disability (STD) and long-term disability ("LTD") benefits plan ("Plan") for its participating employees.

12.    The Plan constitutes employee welfare benefit plans as defined by 29 U.S.C. § 1002 (1).

13.    The Plan offered disability benefits to qualifying Wagner Logistics employee Plan participants.

14.    At all relevant times, Tilson has been a participant and covered person under the terms of the Plan.

15.    Wagner Logistics is the administrator of the Plan.

16.    The Plan's disability provisions are insured by a policy written by United.

17.    Wagner Logistics delegated or attempted to delegate the function of issuing STD and LTD claim determinations to United.

18.    Wagner Logistics and United entered into an administrative services contract through

which Wagner Logistics paid United for acting as claims administrator.

19.    The Plan articulates the conditions under which a Plan participant is entitled to STD and

LTD benefits.

20.    The STD Policy defines the term "Disabled" as follows:

> *Disability* and *Disabled* mean that because of an Injury or Sickness, a significant change in your mental or physical functional capacity has occurred and:
>   a)  during the Elimination Period, you are prevented from performing at least one of the Material Duties of your Regular Job (on a part-time or Full-Time basis); and
>   b)  after the Elimination Period, you are:
>     1.  prevented from performing at least one of the Material Duties of your Regular Job (on a part-time or Full-Time basis); and
>     2.  unable to generate Current Earnings which exceed 99% of your Basic Weekly Earnings due to that same Injury or Sickness.

21.    The STD Policy defines the term "Material Duties" as follows:

> *Material Duties* means the essential tasks, functions, and operations relating to your Regular Job that cannot be reasonably omitted or modified. In no event will we consider working more than the required Full-Time hours per week in itself to be a part of material duties.

22.    The STD Policy defines the term "Regular Job" as follows:

> *Regular Job* means the job you are routinely performing when your Disability begins.

23.    The LTD Policy defines the term "Disabled" as follows:

> *Disability* and *Disabled* mean that because of an Injury or Sickness, a significant change in your mental or physical functional capacity has occurred and:
>   a) during the Elimination Period, you are prevented from performing at least one of the Material Duties of your Regular Job (on a part-time or Full-Time basis); and
>   b) after the Elimination Period, you are:
>     1. prevented from performing at least one of the Material Duties of your Regular Job (on a part-time or Full-Time basis); and
>     2. unable to generate Current Earnings which exceed 99% of your Basic Weekly Earnings due to that same Injury or Sickness.

24.     The LTD Policy defines the term "Material Duties" as follows:

> *Material Duties* means the essential tasks, functions, and operations relating to an occupation that cannot be reasonably omitted or modified. In no event will We consider working an average of more than the required Full-Time hours per week in itself to be a part of material duties. One of the material duties of Your Regular Occupation is the ability to work for an employer on a full-time basis.

25.     The LTD Policy defines the term "Regular Occupation" as follows:

> *Regular Occupation* means the occupation You are routinely performing when Your Disability begins. Your regular occupation is not limited to Your specific position held with the Policyholder, but will instead be considered to be a similar position or activity based on job descriptions included in the most current edition of the U.S. Department of Labor Dictionary of Occupational Titles (DOT). We have the right to substitute or replace the DOT with another service or other information that We determine to be of comparable purpose, with or without notice. To determine Your regular occupation, We will look at Your occupation as it is normally performed in the national economy, instead of how work tasks are performed for a specific employer, at a specific location, or in a specific area or region.

26.     During her employment, Tilson was an "active, full-time employee working in the United States," as required under the Plan.

27.     Tilson's occupation was situated at the sedentary level according to the Dictionary of Occupational Titles, but has Level 5 educational requirements for reasoning, language, and math. The highest-level requirement in the DOT is level 6.

28.     DOT Level 5 requirements for reasoning include logical and scientific reasoning capable of dealing with several abstract and concrete variables.

29.     DOT Level 5 requirements for math include applying concepts in linear algebra, quadratic equations, calculus, analytic geometry, statistics, and factor and variance analysis.

30.    DOT Level 5 requirements for language include reading at the level of scientific and technical journals, writing manuals, editorials, and journals, and being conversant in the theories, principles, and methods of persuasive speaking, discussion, and debate.

31.    On April 20, 2022, and during her employment, Tilson fell from the swivel chair in her office and struck her head against her wooden desk. Unable to get up, she remained on the ground for over an hour before regaining the strength to pick herself off the floor and get back into her chair. She would later fall from her chair a second time and again hit her head. After remaining on the floor for a prolonged period, she again regained the strength to move back into her chair. Because she experienced persistent left-sided weakness, confusion, and dizziness, she eventually drove herself to the hospital.

32.    Following this incident, Tilson began to suffer from a number of health conditions, including ongoing complications from post-concussion syndrome, clouded consciousness, vertigo, forgetfulness, confusion, headache, blurry vision, nausea, dizziness, discoordination of fingers, and left-sided weakness.

33.    These conditions persisted and eventually rendered her incapable of continuing her job on a full-time, competitive basis.

34.    Following her traumatic incident, Tilson was inpatient from April 20, 2022 to April 21, 2022, and underwent testing including an MRI, head and neck CT, and transthoracic echocardiogram. Tilson's head CT revealed chronic findings including diffuse mild atrophy and chronic microvascular disease. Tilson's MRI found moderate chronic small vessel ischemic changes. Her physicians suspected transient ischemic attack or a type of hypertensive urgency.

35.     On April 20, 2022, Tilson was seen by Dr. Cherrie Termulo who noted blurred vision and left-sided weakness on presentation. Tilson was found to have a systolic blood pressure of 190. Her symptoms including weakness had resolved overnight. A CT angio of the head and neck, and MRI brain were negative. Tilson was diagnosed with possible TIA secondary to hypertensive urgency and prescribed stroke preventive treatment of antiplatelet, dual antihypertensive, and statin.

36.     On April 20, 2022, Tilson was also seen by Dr. William Hammack Goodson, who noted blurred vision, and generalized weakness on presentation. Orders to treat hypertension and neuroimaging were placed. Tilson was admitted to Medicine.

37.     On April 20, 2022, Tilson was seen by Dr. Tracy Tran, who reviewed the CT head.

38.     On April 20, 2022, Tilson was seen by Dr. Leanore Miriam Simon, who listed the impression of an episode of transient neurological symptoms with likely etiology of uncontrolled hypertension and hypertensive urgency. Dr. Simon deferred blood pressure treatment to hospitalist service, and recommended stroke preventive interventions.

39.     On April 21, 2022, Tilson was discharged from Advent Health Shawnee Mission. Her clinical discharge summary listed the discharge diagnoses of brain TIA and hypertensive emergency.

40.     Following her discharge, Tilson's symptoms persisted.

41.     On April 26, 2022, Tilson was seen by Dr. Jessica Gillespie-Gebhardas, and was diagnosed with mild concussion after hitting her head on her desk. Symptoms include dizziness, fatigue, and headache.

42.     Tilson applied to United for STD benefits.

43.     Tilson returned to work part time on May 2, 2022, but was unable to continue and went out of work again on June 2, 2022.

44.     On May 13, 2022, Tilson was seen by Dr. Jessica Gillespie-Gebhardas, and reported that the concussion was slowly improving, but was still symptomatic with frequent naps.

45.     Tilson attempted and failed working for the last day on June 2, 2022.

46.     On July 8, 2022. Dr. Michael Stone opined that Tilson could not perform work related duties due to concussion leading to stress on the brain which increased her symptoms of headache, fatigue, dizziness, tinnitus, vision changes, and trouble focusing and concentrating. Dr. Stone opined that Tilson should limit mental and physical activity to allow her brain to rest and recover.

47.     Based on that opinion and other medical information United approved Tilson's STD claim until October 6, 2022.

48.     On June 8, 2022, June 22, 2022, July 8, 2022, August 5, 2022, and September 2, 2022, Tilson was seen by Dr. Michael Stone for concussion follow-ups. Her symptoms were discussed including short term memory difficulty, headache, trouble concentrating and focusing, tinnitus, and sleeping 18-20 hours per day. Over subsequent visits, some of Tilson's symptoms were improving based on her doctor's recommendations but none had resolved as of 9/2/2022 visit. Her headaches were better but continued to be triggered by making her brain work and her trouble with focus and concentration had not improved. Tilson's fatigue was improving but her tinnitus was increased.

49.     On June 9, 2022, Tilson began physical therapy with Amanda Cain, DPT. At that appointment Tilson was highly irritated and unable to tolerate minimal eye and head movements. Tilson was to attend physical therapy 2-3 times per week for 4 weeks.

50.    On July 6, 2022, Tilson was seen by Amanda Cain, DPT, for Physical Therapy Recertification. Cain, DPT, recorded that Tilson showed signs of limitation from depressive type symptoms.

51.    On July 18, 2022, Dr. Stone completed an Attending Physician's Statement form indicating that Tilson was limited in her ability to follow work rules, perform repetitive or short cycle work, perform at a constant pace, maintain attention and concentration, perform a variety of duties, understand, remember and carry out complex job instructions, attain set limits and standard, relate to co-workers, interact with supervisors, interact with the public/customers, use judgment and make decisions, direct, control, or plan activities of others, influence people in their opinions, attitudes, and judgment, and work alone or apart in physical isolation from others. Dr. Stone further reported that writing causes stress on the brain and increases symptoms of fatigue, dizziness, tinnitus, and trouble focusing/concentrating. Tilson was advised to limit physical and mental activities to allow for rest and recovery. Dr. Stone opined that Tilson would need approximately 3 months to return to the prior level of function and did not recommend vocational rehabilitation.

52.    On August 4, September 22, and October 6, 2022, Tilson was seen for Physical Therapy with Cain, DPT. During those appointments Tilson reported a fall sometime in the beginning of September where she fell to the ground, striking her head and shoulder. Tilson reports that this fall significantly re-aggravated her traumatic brain injury ("TBI") symptoms.

53.     On October 14, 2022, Tilson was seen by Dr. John Metzger. Dr. Metzger said that her symptoms were consistent with post trauma vision syndrome and prescribed glasses to treat her vision.

54.     On November 7, 2022, United denied paying further STD benefits after finding that she was no longer disabled. Tilson appealed this decision but United upheld its decision on August 30, 2023.

55.     United based their denial on a review performed by an "external physician consultant" who opined that no functional limitations from a neurology perspective were supported from October 6, 2022, onward.

56.     On November 3, 2022, Dr. Stone saw Tilson and opined that she should not return to work due to persistent difficulty with focus, concentration, and memory.

57.     On November 3, 2022, Unum again referred Tilson's claim to a Dane Street peer review physician, Dr. David Hoenig.

58.     Dr. Hoenig records that Tilson's head CT and brain MRI found chronic findings including diffuse mild atrophy and chronic microvascular disease as well as moderate chronic small vessel ischemic changes.

59.     Despite these findings, Dr. Hoenig opined that there was no functional impairment after October 6, 2022, because there was no documentation of an updated detailed history and physical examination.

60.     Dr. Hoenig did not consider Tilson's age, 66 years old, at all during his report.

61.     Dr. Hoenig did consider Tilson's occupational demands but only the physical demands such as standing, walking, and sitting. Dr. Hoenig did not mention Tilson's occupational cognitive demands at all in his report.

62.    Dr. Hoenig did not meet with, treat, examine, or otherwise interact with Tilson prior to forming his opinion.

63.    Dr. Hoenig was paid $950 for his review report.

64.    On November 11, 2022, Tilson was seen by Dr. Gillespie-Gebhardas. Tilson reported continued headaches after falling out of her chair in April 2021. She was referred to the headache and concussion clinic.

65.    On December 2, 2022, Tilson was seen by Dr. Gillespie- Gebhardas, for a follow-up. Tilson reported that she was no longer seeing Dr. Stone, and that she was referred to the KU concussion center for evaluation. Headaches were her worst symptoms. Tilson missed short-term memory questions and was referred for neuropsychological testing. Her mental health was doing well but the prism glasses were not working. Tilson felt that she is unable to work due to lack of short-term memory, and her focus/concentration was off right now. She was worried about her memory. Tilson was also taking Tylenol and ibuprofen daily. She denied depression or feeling sad or down.

66.    On January 3, 2023, Tilson was seen by Dr. Eric Ecklund-Johnson who completed a Neuropsychological Evaluation. Tilson had 1 or 2 brief word-finding pauses, her affect appeared at least slightly restricted, she displayed mild deficits in attention and processing speed when compared to normative standards, and relative deficits were noted with divided attention/psychomotor speed, and phonemic verbal fluency. Dr. Johnson indicated that Tilson was displaying findings that are typically noted in the acute phase of concussion. Therefore, he opined that there may be other factors that are contributing to the persistence of cognitive difficulties. These factors may include headache pain, daytime sleepiness, depression/anxiety, and adjustment difficulty.

67.     On January 9, 2023, and February 20, 2023, Tilson was seen by Dr. Michael Rippee at the KU concussion clinic. Tilson's symptoms were slowly improving but Tilson continued to complain of tinnitus and headache. At the appointment Dr. Rippee recorded that Tilson was nervous, anxious, confused, and displaying decreased concentration, and opined that she has persistent vestibular-ocular symptoms and cognitive symptoms.

68.     On January 12, 2023, Tilson was seen for a physical therapy initial evaluation by Beth Beach, MSPT. Beach MSPT opined that Tilson displayed signs/symptoms consistent with a mild TBI with vestibular dysfunction.

69.     On January 16, 2023, Tilson was seen by Jennifer Defluiter, MS, CCC-SLP, for Speech-Language Pathology. Defluiter MS, CCC-SLP recorded that her assessment revealed deficits in attention and concentration and recommended speech and cognitive therapy to address attention skills for the ability to return to typical functions with aspects of daily living.

70.     On February 20, 2023, Tilson was seen by Dr. Rippee and was nervous, anxious, and displaying decreased concentration.

71.     On April 3, 2023, Tilson was seen by Dr. Rippee and reported frequent forgetfulness and daily headaches. She could only tolerate a screen for a couple of hours. Dr. Rippee planned to continue vestibular and speech/cognitive therapies and follow up with Dr. Metzger as needed, to start Magnesium 400-600mg twice daily and Riboflavin 400mg daily, and to return in 8 weeks.

72.     On April 5, 2023, United referred Tilson's claim for a medical review with Dr. Tony Smith, a United VP and Medical Director.

73.  Dr. Smith found that because Tilson could drive herself to the ER, grocery shop, and provide records of her medical treatment to United that she was capable of returning to work full time without restriction.

74.  Dr. Smith did not consider Tilson's age, and inconsistently stated "records document an escalation of reported symptoms over time which is inconsistent with a mild concussion that one would expect to improve over time."

75.  Dr. Smith did not meet with, examine, treat, or otherwise interact with Tilson prior to completing his opinion.

76.  Dr. Smith did not review Tilson's vocational requirements other than to state that she was a Director of Human Resources, which is a sedentary position.

77.  On April 12, 2023, Tilson was seen by Beth Beach, MSPT for vestibular physical therapy. She reported brain fatigue after exercises.

78.  April 26, 2023, Tilson was seen by Jennifer DeFluiter, MS CCC-SLP for speech therapy and concussion without loss of consciousness. She was provided with various tasks where she was supposed to provide motor movements to what she said rather than what she saw.

79.  On April 26, 2023, Tilson was seen by Beth Beach, MSPT for vestibular physical therapy. Tilson reported a slight headache but took Tylenol and felt it was a stress headache. She felt her brain was fatigued and overall, more tired. She reported feeling mentally fatigued after today's exercise and had trouble on Brock String.

80.  On May 10 and 24, 2023, United referred Tilson's claim to Dane Street peer review physician Dr. Julian Thomas, and Dr. Debra Sheppard.

81.     Drs. Thomas and Sheppard opined that Tilson meets the diagnostic criteria for post-concussive syndrome but found that Tilson was not restricted or limited from a neuropsychological or neurology standpoint.

82.     Drs. Thomas and Sheppard did not meet with, treat, or otherwise examine Tilson when forming their opinions.

83.     Other than passing references to Tilson's vocational demands and age, Drs. Thomas and Sheppard did not consider Tilson's vocational demands or age when forming their opinions that she was able to work without restrictions or limitations.

84.     May 31, 2023, Tilson was seen for an office visit with Dr. Michael Rippee for post-concussion syndrome. Tilson was recommended to start Magnesium and Riboflavin and continue PRN Tylenol. She was also advised to continue vestibular, speech and cognitive therapies. She reported a definite improvement but was still having trouble with both cognitive and her convergence and light sensitivity. She noticed it while watching TV or being in places with bright lights and at the grocery stores. She noted an improvement in her headaches with the additional of Riboflavin and magnesium and her tinnitus had improved. She was frustrated with not being as quick as she used to be with her thinking. She had difficulty running multiple errands in a day and if she did them would experience fatigue and go straight to bed. The plan was to continue vestibular therapy with recommendations to discuss with therapist about binasal occluding to help improve ambient vision. Tilson was to continue speech/cognitive therapy and medications and follow up in 8 weeks.

85.     On May 31, 2023, Tilson was seen by Jeniffer DeFluiter, MS CCC-SLP and was provided complex attention tasks and asked to identify months of the year when the

previous month was read. She was able to complete task x 3 at 60% consistently. She also completed the same task with the alphabet and was able to complete at 75%. Dr. Rippee wanted Tilson to continue with PT and speech language through July. She continued to be frustrated with her ongoing symptoms.

86.    On June 5, 2023, Tilson was seen by Beth Beach, MSPT. Tilson reported that during her drive to Paola her shoulders started to hurt, and she had a headache. She was also dizzy which eventually resolved. She woke with a headache and took Tylenol. Tilson was mentally and physically fatigued by the end of the appointment.

87.    On September 5, 2023, Tilson applied for LTD benefits.

88.    On September 12, 2023, United acknowledged receipt of Tilson's LTD application which included completed claim forms, a signed Authorization to Release Personal Information, a signed Authorization to Disclose Health Information to My Employer, a Representation Authorization, and a list of her health care providers.

89.    On October 22, 2023, and November 14, 2023, Tilson provided additional information to United and was informed that they would need additional time to make their determination regarding approving her LTD benefits.

90.    On January 2, 2024, Tilson was advised that United had requested medical records from Tilson's providers.

91.    On January 29, 2024, over 130 days after Tilson submitted her Notice of Claim, United advised that Tilson's claim for benefits had been denied.

92.    United based its denial on a medical record reviewed performed by a Dane Street LLC peer-review physician Dr. Rahul Guha who found that Mrs. Tilson did not suffer from any functional restrictions or limitations.

93. Dr. Guha did not meet with, treat, examine, or interact with Tilson prior to forming his opinion.

94. In its January denial United did not share a copy of Dr. Guha's report.

95. On January 31, 2024, Tilson requested a copy of her claim file. The claim file was received on February 23, 2024, and consisted of 5,752 pages. The claim file included, among other things, Dr. Guha's report.

96. Dr. Guha's report reflects that he failed to address the appropriate timeframe for making a disability determination. Though Mrs. Tilson's LTD period would have begun October 20, 2022, Dr. Guha only evaluated her disabled status from January 17, 2024, to January 23, 2024, the date he completed his review.

97. On July 26, 2024, Tilson appealed United's denial of her claim for benefits. In her appeal, Tilson provided additional medical evidence supporting her disability.

98. On August 7, 2024, United referred Tilson's claim to Dane Street LLC peer-review physician Dr. Michael Chilungu.

99. Dr. Chilungu stated there was no evidence to support any restrictions and/or limitations that could impact Tilson's ability to perform the full-time functional demands of her position as Director of Huaman Resources beginning 1/17/2024 forward.

100. Dr. Chilungu did not meet with, examine, treat, or otherwise interact with Tilson prior to forming his opinion.

101. Tilson was not provided with Dr. Chilungu's report until after United made its determination.

102. None of the peer review physicians used by United performed a function-by-function analysis in their reviews.

103.    On September 6, 2024, United advised that Tilson's claim for benefits had again been denied. It further advised that the claim had been reviewed by Dr. Michael Chilungu, who found that Tilson did not suffer from any functional restrictions or limitations. Dr. Chilungu's report was not provided to Tilson in that denial.

104.    Tilson again requested her claim file, which was received on September 11, 2024, and contained a copy of Dr. Chilungu's report.

105.    Dr. Chilungu's report relied heavily on Tilson's statement about moderate improvements to her condition in August 2022 and on the Return-to-Work recommendations made by Tilson's providers in May 2022 and June 2022, ignoring the traumatic injuries suffered in September 2022 that significantly worsened her condition.

106.    Dr. Chilungu's report failed to address corroborating clinical evidence such as Tilson's chronic small vessel ischemic changes, her convergence insufficiency lasting over a year past the date of her initial TBI, her labyrinthine dysfunction, and her continued need for speech and cognitive therapies.

107.    Dr. Chilungu's report contradicts the reports of Lincoln's previous reviewers, including Dr. Thomas.

108.    Dr. Chilungu found that Tilson's TBI symptoms were improving through 2022 and used these supposed improvements to justify his denial recommendation.

109.    Dr. Thomas found that Tilson's TBI symptoms were worsening through 2022. Because Dr. Thomas believed that worsening symptoms are generally inconsistent with traumatic brain injuries, he pointed to Tilson's reports of worsening symptoms as justification for determining that no restrictions or limitations were warranted for a TBI.

110.    Despite United's reviewers proffering mutually exclusive interpretations of Tilson's medical records, these contradictory interpretations were somehow both used by United to justify why Tilson was not eligible for benefits.

111.    On March 5, 2025, Tilson again appealed United's denial and provided United with additional proof of his disabled status.

112.    With her appeal, Tilson detailed the numerous errors committed by United's previous medical reviewers.

113.    On March 27, 2025, United provided Tilson with the report of yet another medical reviewer it had employed to review Tilson's claim, April Ewing, RN.

114.    Nurse Ewing is not a physician and has no stated training or experience in making medical determinations in the field of neurology.

115.    Rather than conducting a clean-slate review of Tilson's claim, Nurse Ewing was simply tasked by United with identifying "any relevant information regarding the claim not addressed in previous medical reviews concerning the insured's functionality."

116.    Nurse Ewing concluded that all relevant information had been "adequately addressed." Nurse Ewing did not provide any analysis or reasoning to support her conclusion.

117.    United's review failed to consider or otherwise address any of the issues specifically raised by Tilson in her appeal comments.

118.    On April 16, 2025, United upheld its denial of benefits.

119.    Tilson has exhausted her administrative remedies and United refuses to take further action in connection with her claims.

120.    At all times, Tilson has remained disabled as defined under the Plan.


CAUSES OF ACTION

COUNT I
29 U.S.C. § 1132(a)(1)(B) – WRONGFUL DENIAL OF
BENEFITS

121.  Tilson realleges the preceding paragraphs as if fully set forth herein.

122.  Tilson is entitled to all unpaid and accrued STD and LTD benefits, as United:

 a.  Made an unfavorable decision without substantial evidence;

 b.  Failed to properly consider Tilson's medical impairments and resulting
  limitations; and

 c.  Issued an unfavorable decision that was arbitrary and capricious.

123.  United has not satisfied its obligation to pay Tilson's STD and LTD benefits.

124.  United denied STD and LTD benefits when the applicable medical record supports
upholding STD and LTD benefits.

125.  WHEREFORE, pursuant to 29 U.S.C. § 1132(a)(1)(B) and 29 U.S.C. § 1132(g), Tilson
prays for judgment against United for unpaid STD and LTD benefits, attorney's fees,
costs, and prejudgment interest.

COUNT II
29 U.S.C. § 1132(a)(3) – BREACH OF FIDUCIARY DUTY

126.  Tilson realleges the preceding paragraphs as if fully set forth herein.

127.  Under 29 U.S.C. § 1002(21)(A), a fiduciary is one who:

"exercises any discretionary authority or discretionary control respecting
management of such plan or exercises any authority or control respecting
management or disposition of its assets, (ii) he renders investment advice
for a fee or other compensation, direct or indirect, with respect to any
moneys or other property or such plan, or has any authority or
responsibility to do so, or (iii) he has any discretionary authority or
discretionary responsibility in the administration of such plan."

128.  29 U.S.C. § 1104(a)(1)(A) describes the fiduciary standard of care:

"a fiduciary shall discharge her duties with respect to a plan solely in the

18

> interest of the participants and beneficiaries and – for the exclusive
> purpose of: (i) providing benefits to participants and their beneficiaries;
> and (ii) defraying reasonable expenses of administering the plan."

129.   United, the Plan's designated claims administrator, is a fiduciary.

130.   United participated in and benefitted from the Plan as previously indicated.

131.   United's claims management practices are motivated by financial incentives in its administrative services agreement with Wagner Logistics.

132.   As the payor of benefits and the entity responsible for exercising discretion in claims administration, United operates under an inherent conflict of interest.

133.   A higher than marketplace quality standard, as set forth in *Metropolitan Life Ins. Co. v. Glenn*, 554 U.S. 105, 128 (2008) governs the actions of a fiduciary.

134.   United breached its fiduciary duty in:

   a.   Failing to comply with its internal guidelines and claims handling procedures. Its claim handlers did not comply with documented instructions involving the administration of disability claims, including its procedures involving coverage and eligibility determinations;

   b.   Failing to properly administer the claim;

   c.   Engaging in a structural conflict of interest by assuming the role of both claims administrator and payor of benefits;

   d.   Failing to properly consider competent medical and vocational opinion evidence, and/or failing to specifically explain why it did not agree with such evidence;

   e.   Failure to engage with or otherwise consider Tison's appeal evidence in a substantive manner;

   f.   Failing to provide a copy of the applicable policy and documents; and

   g.   Refusing to utilize fully executed authorizations to attempt to obtain all relevant

evidence to Tilson's claim for benefits;

135. United denied Tilson's STD and LTD benefits for the purpose of elevating its financial interests. In doing so, it breached its fiduciary duties.

136. United failed to discharge its duties solely in the interests of its participants and beneficiaries. It acted with both a conflict of interest and breached its fiduciary duty to both Tilson and the Plan's participants and beneficiaries generally.

137. United's improper conduct demonstrates that ordinary relief under § 1132(a)(1)(B) is not an adequate remedy.

138. United's violations of regulations alone allow Tilson the right to pursue any remedy under Section 502(a) of ERISA, including § 1132(a)(3). 29 C.F.R. § 2560.503-1(1)(2)(i).

139. United's violations of federal regulation also subject its decision to *de novo* review.

140. WHEREFORE, pursuant to 29 U.S.C. § 1132(a)(3), § 1109, and § 1132(a)(2), Tilson prays for an order that United retrain its employees consistent with ERISA fiduciary obligations and federal regulations; for reformation of its services agreement with the plan administrator consistent with ERISA fiduciary obligations and federal regulations; for an injunction preventing further unlawful acts by United in its fiduciary capacity; for an equitable accounting of benefits that United has withheld; for the disgorgement of profits enjoyed by United in withholding benefits; for restitution under a theory of surcharge; for the Court's imposition of a constructive trust; for pre-judgment interest on wrongfully denied benefits; for an award of attorney fees; and for further relief as the Court deems just.

Respectfully submitted,

BURNETTDRISKILL, Attorneys

By: /s/ Benjamin Narrell
Benjamin Narrell KSD #79228
Derrick A. Pearce KSD #16752
103 W 26th Ave., Ste. 290
North Kansas City, MO  64116
P: 816.781.4836
F: 816.792.3634
dpearce@burnettdriskill.com
bnarrell@burnettdriskill.com
ATTORNEYS FOR PLAINTIFF